## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

**DAVID EARL MILLER**,     )
**NICHOLAS TODD SUTTON**,   )
**STEPHEN MICHAEL WEST**, and )
**LARRY McKAY,**      )
            )
  Plaintiffs,      )
            )  No.
v.           )
            )
**TONY PARKER**, Commissioner, Tennessee )
Department of Correction, in his official capacity, )
            )
  and,        )
            )
**TONY MAYS**, Warden, Riverbend Maximum )
Security Institution, in his official capacity, )
            )
  Defendants.     )

## COMPLAINT FOR INJUNCTIVE RELIEF

1. Plaintiffs are condemned Tennessee inmates. Plaintiff David Miller has an execution date of December 6, 2018. For Plaintiffs' execution by lethal injection the State intends to use a lethal injection protocol (attached hereto as Attachment A, July 5, 2018 Lethal Injection Execution Manual, hereinafter the "July 5th Protocol") whereby they will be injected with a dose of midazolam, followed by a dose of vecuronium bromide, and then a dose of potassium chloride.

2. The use of the July 5th Protocol is unconstitutional. The protocol creates an unnecessarily painful death in violation of Plaintiffs' Eighth and Fourteenth Amendments rights to be free from cruel or unusual punishment, as detailed *infra*.

3. Pursuit of administrative remedies is futile. On January 8, 2018, Defendants adopted a lethal injection protocol that provided unfettered discretion to Defendants to execute Plaintiffs using one of two options: (A) Protocol A, a single-drug protocol calling for the intravenous injection of compounded pentobarbital (retained from the lethal injection protocol effective June 25, 2015 through January 7, 2018); or (B) Protocol B, the sequential injection of midazolam, vecuronium bromide, and potassium chloride (See Attachment B, January 8, 2018 Lethal Injection Manual, hereinafter "January 8th Protocol").

4. Plaintiffs pursued all available administrative relief to prevent Defendants from using Protocol B of the January 8th Protocol. Plaintiffs' grievance was never acted upon. Thereafter, Plaintiffs filed suit in the Chancery Court for Davidson County, Tennessee, asking the Court to, *inter alia*, declare Protocol B unconstitutional in violation of the Eighth and Fourteenth Amendments of the Constitution of the United States.

5. Defendants continued to engage in that conduct against which Plaintiffs sought administrative relief (*i.e.* to move forward with the application of Protocol B against Plaintiffs) without acting upon Plaintiffs' grievance.

6. Instead, Defendants adopted the July 5th Protocol. The July 5th Protocol did not contain an option to use an injection of pentobarbital to carry out Plaintiffs' executions. The July 5th Protocol called for Defendants to engage in that conduct against which Plaintiffs had sought administrative relief.

7. On August 9, 2018, Defendants engaged in that conduct against which Plaintiffs sought administrative relief by carrying out the execution of Tennessee inmate Billy Ray Irick using the July 5th Protocol.

## PARTIES

8. Plaintiff David Earl Miller is a United States citizen. He is a death-sentenced prisoner residing in this District at Riverbend Maximum Security Institution, Nashville, Davidson County, Tennessee, and in the custody of the Tennessee Department of Correction.

9. Plaintiff Nicholas Todd Sutton is a United States citizen. He is a death-sentenced prisoner residing in this District at Riverbend Maximum Security Institution, Nashville, Davidson County, Tennessee, and in the custody of the Tennessee Department of Correction.

10. Plaintiff Stephen Michael West is a United States citizen. He is a death-sentenced prisoner residing in this District at Riverbend Maximum Security Institution, Nashville, Davidson County, Tennessee, and in the custody of the Tennessee Department of Correction.

11. Plaintiff Larry McKay is a United States citizen. He is a death-sentenced prisoner residing in this District at Riverbend Maximum Security Institution, Nashville, Davidson County, Tennessee, and in the custody of the Tennessee Department of Correction.

12. Defendant Tony Parker is the Commissioner of the Tennessee Department of Correction, the state agency located in Nashville, Tennessee, that

adopted and will implement the July 5th Protocol challenged in this Complaint. Plaintiffs sue Commissioner Parker in his official capacity. Defendant Parker will oversee the administration of Plaintiffs' executions at Riverbend Maximum Security Institute (hereinafter, "RMSI"). Defendant Parker is a state actor acting under color of state law, and his actions in seeking to execute and/or executing Plaintiffs under the Lethal Injection Protocol, as described herein, violate Plaintiffs' constitutional and statutory rights, described herein.

13. Defendant Tony Mays is the Warden of Riverbend Maximum Security Institution in Nashville, Tennessee, at which Plaintiffs are held in custody under sentence of death and where Plaintiffs executions will occur. Plaintiffs sue Warden Mays in his official capacity. Defendant Mays is directly in charge of executing Plaintiffs at RMSI. Defendant Mays is a state actor acting under color of state law, and his actions in seeking to execute and/or executing Plaintiffs under the July 5th Protocol, as described herein, violate Plaintiffs' constitutional and statutory rights, as described herein.

## JURISDICTION AND VENUE

14. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), § 2201 (declaratory relief), and § 2202 (further relief). This action arises under the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

15. As to exhaustion of administrative remedies, Plaintiffs do not concede a need to exhaust administrative remedies because any administrative process is

futile. Immediately upon receiving notice that Tennessee had adopted its new lethal injection protocol that included a midazolam-based three-drug method of lethal injection, designated as Protocol B, Plaintiffs filed a grievance objecting to the use of Protocol B for their executions.

16.    Plaintiffs' grievance was never acted upon, Thereafter, Plaintiffs filed suit in the Chancery Court for Davidson County, Tennessee, asking the Court to, *inter alia*, declare Protocol B unconstitutional in violation of the Eighth and Fourteenth Amendments of the Constitution of the United States. Defendants continued to engage in that conduct against which Plaintiffs sought administrative relief.

17.    Notwithstanding Plaintiffs' grievances and the pendency of the state chancery court proceedings, Defendants adopted the July 5th Protocol which is the subject of this action.

18.    The July 5th Protocol removed Protocol A, the option to use an injection of a single drug, pentobarbital, to carry out Plaintiffs' executions.

19.    The July 5th Protocol called for Defendants to engage in that conduct against which Plaintiffs had sought administrative relief, *i.e.* to use a midazolam-based three-drug lethal injection method of execution, but added provisions allowing the use of compounded drugs, and removed other provisions which had formerly benefitted Plaintiffs.

20.    On August 9, 2018, Defendants engaged in that conduct against which Plaintiffs sought administrative relief by carrying out the execution of Tennessee

inmate Billy Ray Irick using the midazolam-based three-drug lethal injection method of execution required by the July 5th Protocol.

## **FACTS**

21.     Tennessee Code Annotated § 40-23-114 provides:

§ 40-23-114. Capital punishment; electrocution; lethal injection

(a) For any person who commits an offense for which the person is sentenced to the punishment of death, the method for carrying out this sentence shall be by lethal injection.

(b) Any person who commits an offense prior to January 1, 1999, for which the person is sentenced to the punishment of death may elect to be executed by electrocution by signing a written waiver waiving the right to be executed by lethal injection.

(c) The department of correction is authorized to promulgate necessary rules and regulations to facilitate the implementation of this section.

(d) If lethal injection or electrocution is held to be unconstitutional by the Tennessee supreme court under the Constitution of Tennessee, or held to be unconstitutional by the United States supreme court under the United States Constitution, or if the United States supreme court declines to review any judgment holding lethal injection or electrocution to be unconstitutional under the United States Constitution made by the Tennessee supreme court or the United States court of appeals that has jurisdiction over Tennessee, or if the Tennessee supreme court declines to review any judgment by the Tennessee court of criminal appeals holding lethal injection or electrocution to be unconstitutional under the United States or Tennessee constitutions, all persons sentenced to death for a capital crime shall be executed by any constitutional method of execution. No sentence of death shall be reduced as a result of a determination that a method of execution is declared unconstitutional under the Constitution of Tennessee or the Constitution of the United States. In any case in which an execution method is declared unconstitutional, the death sentence shall remain in force until the sentence can be lawfully executed by any valid method of execution.

22.     Plaintiffs have not elected a method of execution. Accordingly, under Tennessee Code Annotated § 40-23-114(a) and (b), the death sentence will be carried out by lethal injection.

23.     On January 8, 2018, the Tennessee Department of Correction issued a lethal injection protocol. The new protocol retained from Tennessee's protocol effective March 13, 2017 through January 7, 2018, a single drug procedure utilizing 5 grams of pentobarbital (designated as Protocol A[1]).  It added the option of a new execution procedure, Protocol B, utilizing 500 mg of midazolam, 100 mg of vecuronium bromide, and 240 mEq of potassium chloride. (Attach. B, p.34).

24.     The midazolam option provided for the sequential injection of three drugs as follows: "midazolam – 100 ml of a 5mg/ml solution (a total of 500 mg); vecuronium bromide – 100 ml of a 1 mg/ml solution (a total of 100 mg); potassium chloride – 120 ml of a 2 mEq/ml solution (a total of 240 mEq)." (*Id*.).

25.     Plaintiffs, together with other Tennessee inmates (hereinafter "plaintiffs in the state chancery court action") sought judgment from the Chancery Court declaring the use of the midazolam option unconstitutional because, *inter alia*, it inflicted unnecessary and severe pain and suffering, and Tennessee's one-drug pentobarbital option (former Protocol A) was a feasible and readily available

---

[1] Protocol A was retained from the protocol immediately preceding the January 8 protocol, and it provides the injection of 50 cc of pentobarbital from two syringes for a total of 5 grams of pentobarbital (*see e.g.*, Attach. B, pp.34-36, 39, 42-44, 45, 64, 65-67, 72-73). The Tennessee Supreme Court has found Protocol A does not violate the Eighth Amendment or Article I, section 16 of the Tennessee Constitution. *West v. Schofield*, 519 S.W.3d 550, 568 (Tenn. 2017).

alternative method of carrying out Plaintiffs' executions which substantially reduced such pain and suffering.

26.     On April 11, 2018, counsel for Defendants stated in open court and upon the record that Defendants refused to state whether the one-drug protocol, Protocol A, was available and/or would be available for Plaintiffs' executions. Defendants persisted in their refusal notwithstanding the trial court's express warning to Defendants that Plaintiffs could not determine whether to plead another alternative without such information and that Defendants' refusal would create the need for extensive discovery.

27.     On May 5, 2018, in their answer to the first amended complaint of the plaintiffs in the state chancery court action, Defendants continued in their refusal, stating that they were without sufficient knowledge to admit or deny whether Protocol A constituted a feasible and readily available alternative.

28.     During the June 20, 2018 deposition of Department of Correction Commissioner Tony Parker stated the Department of Correction had not to that point been able to obtain pentobarbital to carry out Protocol A.

29.     During that deposition, however, Commissioner Parker, also stated the Tennessee Department of Correction was continuing to search for pentobarbital and Option A would be used to execute Plaintiffs if midazolam were found.

30.     Fifteen days later, on July 5, 2018, four days before trial, Defendant Parker adopted the July 5th Protocol. The July 5th Protocol removed the option of

the one-drug pentobarbital procedure, Protocol A, and made other substantive changes to the January 8th Protocol.

31.     Under the July 5th Protocol, the default method for carrying out executions in Tennessee became the sequential injection of three drugs: "midazolam – 100 ml of a 5mg/ml solution (a total of 500 mg); vecuronium bromide – 100 ml of a 1 mg/ml solution (a total of 100 mg); potassium chloride – 120 ml of a 2 mEq/ml solution (a total of 240 mEq).

32.     On July 5, 2018, Defendant Parker and the other defendants in the state chancery court action filed their answer to the then-pending Second Amended Complaint in the state chancery court action.

33.     In their July 5, 2018 answer, Parker and the other defendants for the first time denied the allegation that Protocol A of the January 8th Protocol, the one-drug pentobarbital option, constituted a feasible and readily available alternative to Tennessee's midazolam-based three-drug protocol, the sole method of lethal injection contained in the July 5th Protocol.

34.     On July 5, 2018, plaintiffs in the state chancery court action filed their trial brief. In that brief they stated:

> Finally, discovery in this case has revealed at least three other feasible and readily implemented alternatives to Protocol B as written: (1) Defendants could eliminate the use of vecuronium bromide-according to their own witnesses it is unnecessary to cause death or preventing pain, is a noxious stimuli capable of overcoming any sedative effect of the midazolam, and prolongs Plaintiffs suffering by at least three minutes . . .

35. Before trial began, undersigned counsel, who also represented Messrs. Miller, Sutton, West, and McKay in the state chancery court action, gave a separate opening statement on their behalves. In it, he informed the state court that Defendant Parker's adoption of the July 5th Protocol on the eve of trial gave rise to new causes of action and Miller, Sutton, West and McKay were entitled to due process for such causes of actions.

36. During trial, the plaintiffs in the state chancery court action introduced expert testimony explicitly explaining how the removal of vecuronium bromide from the midazolam-based three-drug option would substantially reduce the pain and suffering it created.

37. The plaintiffs in the state chancery court action also introduced testimony from Defendant Parker that as commissioner of the Tennessee Department of Correction, he saw no obstacle to removing vecuronium bromide from the protocol.

38. Plaintiffs in the state chancery court action also introduced lay testimony that the United States District Court for the District of Arizona had found the removal of vecuronium bromide from Arizona's materially identical midazolam-based three-drug protocol constituted a feasible and readily available alternative under the decision of the United States Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008) and *Glossip v. Gross*, 135 S. Ct. 2726 (2015).

39. At the conclusion of trial, the plaintiffs in the state chancery court action moved the court pursuant to Rule 15.02 of the Tennessee Rules of Civil

Procedure to amend the pleadings to conform to the evidence to include the allegation that – as an alternative to the one-drug protocol plaintiffs had previously pled, but Defendant Parker had removed on the eve of trial – the removal of vecuronium bromide from a midazolam-based three-drug protocol was a feasible and readily available alternative under the decision of the United States Supreme Court in *Baze* and *Glossip*.

40.     The trial court denied the motion.

41.     In the same order, the court *sua sponte* "amended the pleadings" to include consideration of the July 5th Protocol.

42.     Miller, Sutton, West, and McKay promptly filed a motion seeking reconsideration of the trial court's *sua sponte* order, objecting to the court's order, and asking the court to allow them to amend their pending complaint to add separate causes of action challenging the July 5th Protocol. Further, they move the court to bifurcate consideration of all claims arising out of the July 5th Protocol, except such of those claims as have been specifically raised by the pleadings or explicitly raised through the evidence presented at trial.

43.     The court denied their motion.

44.     The court then denied relief to all plaintiffs in the state chancery court action.

45.     Denying their claim that Tennessee's midazolam-based three-drug method of execution violated the Eighth and Fourteenth Amendments, the court found plaintiffs had failed to prove the one-drug protocol constituted a feasible and

readily available alternative and therefore failed to meet the first prong of the *Glossip/Baze* test.

46.     As to the second prong of the *Glossip/Baze* test, the court found the plaintiffs in the state chancery court action presented the testimony of four well-qualified and imminent experts.

47.     The court added that the experts established that midazolam does not elicit strong analgesic effects and the inmate being executed may be able to feel pain from the administration of the second and third drugs.

48.     The court, however, found other courts considering other evidence had found to the contrary and that the findings of those courts would be weighed against the evidence presented by the plaintiffs in the state chancery court action.

49.     On August 9, 2018, the State of Tennessee executed Billy Ray Irick using the July 5th Protocol.

50.     Following the injection of 100 ml of a 5mg/ml solution (a total of 500 mg) of midazolam, fluid began to accumulate in Mr. Irick's lungs, making it more difficult for him to breathe. Witnesses to his execution saw Irick's stomach move up and down, his breathing become labored, and him begin to snore.

51.     According to witnesses to Irick's execution, seven minutes after the injection of midazolam began, Defendant Mays approached Mr. Irick, brushed his eyelash, called his name loudly two times, and shook his shoulder. Defendant Mays then gave the order to administer 100 ml of a 1 mg/ml solution (a total of 100 mg) of vecuronium bromide.

52.     Throughout the preceding seven minutes, fluid had continued to accumulate in Irick's lungs.

53.     Before the vecuronium bromide paralyzed Mr. Irick (including his diaphragm, the muscle used to control the lungs), making it impossible for him to move, enough fluid had accumulated in Mr. Irick's lungs that he began to gasp and to cough in an attempt to expel the accumulated fluid. This gasping and coughing was observed by witnesses to his execution.

54.     Mr. Irick remained conscious throughout this time.

55.     After the vecuronium bromide paralyzed Mr. Irick, witnesses to his execution observed that he had become motionless.

56.     Though motionless, Mr. Irick remained conscious.

57.     Mr. Irick was aware of both his involuntary paralysis and his ongoing suffocation caused by the use of vecuronium bromide until his death.

58.     After Mr. Irick had consciously suffocated for between three to four minutes, he was injected with 120 ml of a 2 mEq/ml solution (a total of 240 mEq) of potassium chloride.

59.     Mr. Irick remained conscious after the injection of potassium chloride until after the complete cessation of cardiac activity.

60.     Mr. Irick was aware of the pain caused by potassium chloride as it passed through his veins.

61.     The pain and suffering caused by potassium chloride as it passed through a human being's veins has been described as "liquid fire" and/or "being burned alive from the inside."

62.     Mr. Irick was aware of this pain and suffering for three to four minutes.

63.     After three to four minutes of this pain and suffering, a sufficient amount of potassium chloride reached Mr. Irick's heart to cause cardiac arrest.

64.     Mr. Irick was aware of the pain and suffering caused by cardiac arrest.

65.     It was not until after he had experienced cardiac arrest that Mr. Irick ceased experiencing the pain and suffering caused by the July 5th Protocol.

66.     On December 6, 2018, should Defendants not be enjoined from using the July 5th Protocol, Plaintiff Miller will experience materially the same pain and suffering experienced by Mr. Irick, or worse pain and suffering.

67.     Should Defendants not be enjoined from using the July 5th Protocol, the remaining Plaintiffs will experience materially the same pain and suffering experienced by Mr. Irick, or worse pain and suffering, on such dates as the Tennessee Supreme Court orders their executions.

## CAUSES OF ACTION

### COUNT I
### Eighth and Fourteenth Amendments
### (INHERENT SUBSTANTIAL RISK OF UNNECESSARY PAIN)

68.     The use of the July 5th Protocol violates Plaintiffs' rights under the Eighth and Fourteenth Amendments to the United States Constitution because it is

sure or very likely, *i.e.*, there is a substantial risk, that, if Plaintiffs are executed in accordance with this protocol, they will experience unnecessary pain and suffering during their executions. Such pain is substantially greater than the pain and suffering caused by other feasible and readily available methods of carrying out their sentences of death.

69. Even if every step set forth in the July 5th Protocol is followed perfectly, there is a substantial risk Plaintiffs will experience unnecessary pain and suffering during their executions which is substantially greater than the pain and suffering caused by feasible and readily available methods of carrying out their sentences of death.

70. For the reasons set forth herein, there is a substantial risk the use of midazolam as the initial drug in a three drug protocol, followed by the use of a paralytic drug such as vecuronium bromide, followed by the use of potassium chloride, will cause Plaintiffs to experience unnecessary pain and suffering during their executions which is substantially greater than the pain and suffering caused by feasible and readily available methods of carrying out their sentences of death.

71. No provision of the July 5th Protocol reduces such risk, more specifically:

   a. The use of a dose of midazolam in excess of the maximum therapeutic and/or clinically-studied dose of midazolam does not reduce the risk that Plaintiffs will experience unnecessary pain and suffering during their executions which is substantially

greater than the pain and suffering caused by other feasible and readily available methods of carrying out their sentences of death.

b.    Unlike anesthetic drugs, the maximum effect of midazolam is reached when therapeutic and/or clinically studied doses have been administered. The administration of midazolam in amounts in excess of therapeutic and/or clinically studied doses has no effect.

c.    Midazolam, even at its maximum effect, will not prevent Plaintiffs from experiencing the pain and suffering caused by the subsequent injections of vecuronium bromide and potassium chloride required by the July 5th Protocol.

d.    The putative "test for consciousness" contained in the July 5th Protocol will not determine whether Plaintiffs will experience the pain and suffering caused by the subsequent injections of vecuronium bromide and potassium chloride required by the July 5th Protocol.

e.    The putative "test for consciousness" contained in the July 5th Protocol will determine no more than whether Plaintiffs will physically respond in a manner detectable to Defendant Mays to the stimuli utilized during the "test."

f.    The putative "test for consciousness" contained in the July 5th Protocol, and all other tests dependent upon a person's physical response to noxious stimuli, are indicative of consciousness and/or unconsciousness <u>only</u> when used in conjunction with a drug capable of rendering a person unconscious.

g.    Midazolam is incapable of rendering Plaintiffs unconscious at any dose.

h.    Because Midazolam is incapable of rendering Plaintiffs unconscious at any dose, even if Plaintiffs do not physically respond in a manner detectable to Defendant Mays to the stimuli utilized during the "test," they will not be unconscious.

72.    Because Midazolam is incapable of rendering Plaintiffs unconscious at any dose, there is substantial risk that Plaintiffs will experience the pain and suffering of involuntary paralysis and suffocation caused by vecuronium bromide, the pain and suffering caused by potassium chloride as it passes through their veins and the pain and suffering caused by cardiac arrest.

73.    The pain and suffering of involuntary paralysis and suffocation caused by vecuronium bromide, the pain and suffering caused by potassium chloride as it passes through their veins, and the pain and suffering caused by cardiac arrest is constitutionally unacceptable. *Baze v. Rees*, 553 U.S. 35, 53 (2008); *In Re: Ohio Execution Protocol* (*Fears v. Morgan*), 860 F.3d 881, 886 (6th Cir. 2017), *cert. denied sub nom. Otte v. Morgan*, 137 S. Ct. 2238 (2017).

{17}

74.    Vecuronium bromide is not necessary to execute Plaintiffs, accordingly, the pain and suffering caused by vecuronium bromide is not necessary to execute Mr. Miller.

75.    Potassium chloride is not necessary to execute Mr. Miller, accordingly, the pain and suffering caused by potassium chloride is not necessary to execute Mr. Miller.

76.    Midazolam is not a barbiturate.

77.    Midazolam is a benzodiazepine.

78.    Midazolam is not an anesthetic.

79.    Midazolam is a sedative. Sedation is a state of calm or sleep.

80.    Midazolam has no analgesic effects, *i.e.*, it does not stop an individual from feeling pain.

81.    Midazolam, by its nature, cannot induce and/or maintain a state where a person is unaware or insensate to the pain and suffering of involuntary paralysis and suffocation caused by vecuronium bromide, the pain and suffering caused by potassium chloride as it passes through their veins, and the pain and suffering caused by cardiac arrest.

82.    Midazolam's inhibitory effect on the central nervous system is limited.

83.    Midazolam, as a benzodiazepine, affects the central nervous system by facilitating the activity of GABA receptors, the primary effect of which is to reduce anxiety.

84. Gamma amino-butyric acid (GABA) is a primary neurotransmitter that inhibits central nervous system activity.

85. When inhibitory neurons of the brain release GABA onto other brain neurons, GABA binds to GABA-specific receptors. This binding causes chloride ion channels to open on the recipient neurons.

86. The influx of chloride ions through the channels causes those neurons to become more quiescent, to decrease in electrical activity, and to decrease the likelihood of neuronal firing, resulting in neuronal inhibition and central nervous system depression.

87. Midazolam, as a benzodiazepine, promotes the binding of GABA to GABA[A] receptors, which are ion channels with multiple binding sites that can be opened by GABA.

88. Once all GABA receptors are bound, additional midazolam does not have a pharmacological effect upon the central nervous system. Thus, there is a "ceiling effect" with midazolam.

89. Because of the ceiling effect, 500 mg of midazolam is no more effective than the minimum dose of midazolam required to bind available GABA receptors.

90. There is a substantial risk Plaintiffs will experience unnecessary pain and suffocation regardless of the quantity of midazolam injected.

91. There exists a substantial risk that the use of midazolam as required under the July 5th Protocol will not prevent Plaintiffs from experiencing the pain and suffering of involuntary paralysis and suffocation caused by vecuronium

bromide, the pain and suffering caused by potassium chloride as it passes through their veins, and the pain and suffering caused by cardiac arrest.

92.     The July 5th Protocol does not include a procedure or instructions to determine whether Plaintiffs will experience the pain and suffering of involuntary paralysis and suffocation caused by vecuronium bromide, the pain and suffering caused by potassium chloride as it passes through their veins, and the pain and suffering caused by cardiac arrest.

93.     The absence of such a provision increases the risk that Plaintiffs will become aware and/or sensate to the pain and suffering of involuntary paralysis and suffocation caused by vecuronium bromide, the pain and suffering caused by potassium chloride as it passes through their veins, and the pain and suffering caused by cardiac arrest.

94.     The July 5th Protocol does not provide procedures or instructions for monitoring Plaintiffs' awareness of pain.

95.     The absence of such provisions needlessly increases the risk that Plaintiffs will experience the pain and suffering of involuntary paralysis and suffocation caused by vecuronium bromide, the pain and suffering caused by potassium chloride as it passes through their veins, and the pain and suffering caused by cardiac arrest.

96.     Vecuronium bromide is the second drug used in the July 5th Protocol.

97.     Vecuronium bromide is a neuromuscular blocking agent that produces paralysis, including paralysis of respiratory muscles.

98.     A neuromuscular blocking agent blocks the receptor sites in muscle tissue that receive nerve impulses.

99.     When these sites are blocked, the nerve impulses have no effect on the muscle tissue, which means that the muscle tissue will no longer contract causing paralysis.

100.    A neuromuscular blocking agent has no effect on the central nervous system, and consequently it has no effect on consciousness or the sensation of pain and suffering.

101.    When the diaphragm and other muscles that control breathing are paralyzed, Plaintiffs will experience the sensation of suffocation without being able to respond.

102.    Plaintiffs will not be able to respond by breathing, by moving, or by facial or vocal expressions.

103.    The use of vecuronium bromide under the July 5th Protocol will render Plaintiffs unable to move.

104.    The use of vecuronium bromide under the July 5th Protocol will render Plaintiffs unable to breathe.

105.    The use of vecuronium bromide will prevent any pain responses from being observed.

106.    Midazolam will not prevent Plaintiffs from experiencing the pain and suffering of suffocation caused by Defendants' use of vecuronium bromide.

107.  When Plaintiffs experience the pain and suffering of suffocation, their bodies will respond with an immediate and extreme spike in adrenaline and other stress hormones.

108.  The use of vecuronium bromide is unnecessary.

109.  Potassium chloride, the third drug in the July 5th Protocol, is a metal halide salt composed of potassium and chloride.

110.  Under the July 5th Protocol, the intravenous injection of potassium chloride will cause a searing, burning, sensation in the veins.

111.  Under the July 5th Protocol, midazolam will not prevent Plaintiffs from experiencing the searing, burning, sensation in the veins caused by the intravenous injection of potassium chloride.

112.  Under the July 5th Protocol, the intravenous injection of potassium chloride will cause the involuntary cessation of Plaintiffs' cardiac activity, *i.e.*, a heart attack.

113.  Under the July 5th Protocol, midazolam will not prevent Plaintiffs from experiencing the pain and suffering of a heart attack caused by potassium chloride.

114.  The use of potassium chloride as part of a lethal injection protocol is unnecessary.

## FEASIBLE AND READILY AVAILABLE ALTERNATIVES

115.  The alternative-method requirement violates Plaintiffs' rights under the Fourteenth and Eighth Amendments.

116.     Plaintiffs dispute the requirement for each to choose a method of their own execution because it inflicts serious psychological harm and is itself a type of cruel and unusual punishment. The Eighth Amendment does not require Plaintiffs to plead an alternative execution method in order to establish that the current execution method is unconstitutional.

117.     The Supreme Court's decision in *Baze v. Rees*, 553 U.S. 35 (2008), held that a State's refusal to adopt proffered alternative procedures may violate the Eighth Amendment only where the alternative procedure is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain.

118.     *Baze* did not hold that a condemned inmate must plead an alternative method of execution in order to demonstrate that an execution protocol violates the Constitution.

119.     *Baze* and *Glossip* require a condemned inmate who brings an Eighth Amendment cause of action under § 1983 and who seeks a preliminary injunction to establish both that "the State's lethal injection protocol creates a demonstrated risk of severe pain" and "that the risk is substantial when compared to the known and available alternatives." *Glossip*, 135 S. Ct. at 2737 (citing *Baze*, 553 U.S. at 61).

120.     *Glossip* arose from the Tenth Circuit's affirmation of an order denying a motion for a preliminary injunction. The decision in *Glossip* created a new pleading requirement for certain § 1983 challenges under the Eighth Amendment to a state's method of execution.

121. Four justices dissented from the requirement that a condemned inmate who brings an Eighth Amendment cause of action under § 1983 must "identify an alternative that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.'" *Glossip*, 135 S. Ct. at 2737 (quoting *Baze*, 553 U.S. at 52); *Id.* at 2781 (Sotomayor, J., dissenting, joined by Breyer, Ginsburg and Kagan, JJ.).

122. In creating the new pleading requirement for certain § 1983 challenges under the Eighth Amendment to a State's method of execution, the *Glossip* majority's justification was that capital punishment is legal and there must be a way to carry it out.

123. There is no logical connection between the burden to prove under *Baze* that a method of execution is unconstitutional and the new requirement under *Glossip* that the inmate must propose a constitutionally sound method of execution. *Glossip*, 135 S. Ct. at 2795 (Sotomayor, J., dissenting) ("In reengineering *Baze* to support its newfound rule, the Court appears to rely on a flawed syllogism. If the death penalty is constitutional, the Court reasons, then there must be a means of accomplishing it, and thus some available method of execution must be constitutional.").

124. The new pleading requirement is not driven by a desire to ensure executions are done in a manner compliant with the Eighth Amendment. *Glossip*, 135 S. Ct. at 2795 (Sotomayor, J., dissenting) ("a method of execution that is 'barbarous,' *Rhodes*, 452 U.S., at 345, 101 S. Ct. 2392, or 'involve[s] torture or a

lingering death,' *Kemmler*, 136 U.S., at 447, 10 S. Ct. 930, does not become less so just because it is the only method currently available to a State.").

125.   The new pleading requirement is driven by animus toward inmates who challenge methods of execution. *Glossip*, 135 S. Ct. at 2795-96 (Sotomayor, J., dissenting).

126.   The new pleading requirement is driven by animus toward those—not Plaintiffs—who allegedly lobbied large corporations to stop providing execution drugs to departments of correction. *Id.*

127.   In no other area of the law is a plaintiff required to propose an alternative lawful act in order to vindicate constitutional rights.

128.   Condemned inmates in Tennessee do not have access to all of the information about executions to be able to propose alternative methods of execution.

129.   The least restrictive alternative is also the most logical alternative; *i.e.*, requiring departments of correction to follow the Constitution and not use methods of execution that make it sure or very likely that there is a substantial risk of unnecessary and severe pain.

130.   Applying the alternative-method requirement to Plaintiffs therefore violates the Eighth and Fourteenth Amendment, and it should not be enforced here.

131.   The alternative-method requirement violates Plaintiffs' Fifth Amendment rights.

132.   Notwithstanding any allegation of an alternative execution method or manner pleaded in this Complaint, Plaintiffs assert the Fifth Amendment right

against self-incrimination insofar as said constitutional right may permit them to decline to affirmatively plead an alternative method or manner for execution that would not be cruel and unusual. See *United States v. Myers*, 123 F.3d 350, 359 (6th Cir. 1997) ("'[T]he privilege against self-incrimination can be asserted 'in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory.'") (quoting *Maness v. Meyers*, 419 U.S. 449, 464 (1975)); *United States v. Rivera*, 201 F.3d 99, 101 (2d Cir. 1999) ("The Fifth Amendment provides a 'safeguard against judicially coerced self-disclosure,' and this safeguard extends to the sentencing phase of a criminal proceeding as well." (citation omitted) (quoting *Mitchell v. United States*, 526 U.S. 314, 322 (1999)).

133.    If Plaintiffs must allege an alternative method of execution, they allege the following alternative execution method(s) are feasible, readily implemented and in fact significantly reduce a substantial risk of severe pain presented by the new July 5th Protocol (three compounded high-risk drugs).

134.    By alleging any of these alternatives, Plaintiffs allege only that the alternative significantly reduces the substantial risk of unnecessary and severe pain posed by the current execution method.

135.    To the extent that the courts have placed a burden on Plaintiffs to demonstrate a "known and available alternative method of execution that entails a lesser risk of pain[,]" *Glossip*, 135 S. Ct. at 2731, Plaintiffs allege as follows.

**Proposed Alternative One – The One-drug Pentobarbital Method**

136.   Notwithstanding the state chancery court's determination that pentobarbital, and therefore Protocol A of the January 8, 2018 Protocol, was unavailable at the time of the state court hearing, notwithstanding Defendants' efforts to find pentobarbital, Plaintiffs allege there are now available sources of pentobarbital:

a.  Defendants are able to obtain pentobarbital from veterinary sources. It is equally as feasible, if not more so, to obtain a prescription from a compliant veterinarian as it is a compliant physician. The identities of compliant veterinarians are afforded the same protection as are the identities of physicians. Defendants have already been instructed how to develop veterinary sources of pentobarbital by their current supplier of midazolam.

b.  Defendants are able to obtain pentobarbital from overseas sources. FDA-approved pentobarbital may be obtained after securing the proper licenses from the United States government. Defendants have never been denied such licenses. Moreover, Defendants may obtain pentobarbital which has not been approved by the FDA from an almost unlimited number of sources. Defendants have used such sources in the past.

c.  Pentobarbital in quantities sufficient to carry out executions under Tennessee's former Protocol A is also available from organizations

promoting assisted suicide simply by representing to such organizations that it will be used for such purposes.

137. Inmates within the United States have been executed by protocols similar to former Protocol A, using pentobarbital, as recently as July 17, 2018.

138. Protocol A significantly reduces the substantial risk of pain caused by the July 5th Protocol because it removes the pain-causing drugs (vecuronium bromide and potassium chloride).

139. Eliminating the substantial risk of severe pain posed by vecuronium bromide and potassium chloride as used in the new July 2018 Protocol, by definition, will significantly reduce the substantial risk of severe pain caused by the new July 2018 Protocol.

140. Other states remain able to obtain pentobarbital or other barbiturates.

141. This year, Texas has carried-out eight executions using a one-drug pentobarbital method. This includes at least one execution using recently-obtained pentobarbital.

142. Georgia, also this year, has carried-out two executions using a one-drug pentobarbital protocol.

143. Defendants have obtained drugs that are subject to manufacturer-imposed restrictions.

144. Defendants obtained quantities of midazolam, notwithstanding it being subject to manufacturer-imposed restrictions, on October 26, 2017, November 1, 2017, November 27, 2017, December 14, 2017 and December 28, 2017.

{28}

145.   Defendants ignored a commercial manufacturer's request to return midazolam obtained in violation of distribution controls, and Defendants kept the midazolam.

146.   Defendants have actual knowledge that pentobarbital (Nembutal) is widely available in the United States and Europe.

147.   Upon information and belief, Defendants drug source explained how Defendants could obtain pentobarbital from a veterinarian.

148.   Certain companies specialize in supplying pharmaceuticals to departments of correction.

149.   For example, one company that sells pharmaceuticals to departments of correction—Clinical Solutions Pharmacy—is located in Franklin, Tennessee. Another company, IHS Pharmacy, is located in Alabama and conducts business with correctional facilities in Tennessee.

150.   Defendants have a physician willing to write a prescription for execution drugs.

151.   Defendants have a pharmacy and pharmacist in their employment.

152.   Defendants have two valid contracts requiring two different drug sources to provide drugs for executions. Plaintiffs refer to those sources as Direct Source A (2014) and Direct Source B (2017).

153.   In addition to the provisions included in the former Protocol A, Defendants must employ a wedge-shaped cushion of sufficient height to prevent

obstruction, like the one used in Ohio, to prop Plaintiffs up at an angle during the execution.

154.    Plaintiffs allege that the use of a wedge-shaped cushion to prop them up at an angle that will significantly reduce the substantial risk of obstruction. If Plaintiffs are supine on the gurney there is a substantial risk that the soft tissues in the back of the throat will collapse into the airway when they lose muscle tension after injection of the drugs.

155.    Plaintiffs allege that using a wedge-shaped cushion is an available and feasible alternative to obstruction and air hunger, because Defendants possess or have within their control, or could obtain with ordinary effort, a wedge-shaped cushion.

156.    Plaintiffs allege that death caused by a lethal dose of pentobarbital when they are propped up with a wedge cushion will not involve any of the unnecessarily severe pain and suffering caused by obstruction and air hunger. In other words, using a wedge-shaped cushion for Plaintiffs' executions will significantly reduce a substantial risk of serious and unnecessary pain.

157.    Defendants must inject the lethal drug bedside rather than from the Lethal Injection Executioner's Room through several feet of IV tubing.

158.    Bedside injection will protect Plaintiffs against receiving diluted and less effective execution drug(s), thereby ensuring the proper concentration and potency and the most rapid arm-brain circulation of the drug. Any reduction in time

of death is a significant reduction of the substantial risk of a lingering death under the former Protocol A.

159.    Bedside injection will aid in the detection of, and will significantly reduce the substantial risk of, pain from infiltration or a dislodged catheter caused by the bolus doses of drugs required under the former Protocol A.

160.    This portion of this Alternative is feasible and readily implemented because Defendants already establish IV access on inmates in the Execution Chamber at bedside. Inserting and injecting a syringe of execution drug directly into a port in the IV catheter is no more difficult—indeed, is easier—than inserting and injecting a syringe of execution drug into a port connected to lengthy IV tubing. Some Defendants are already in the Execution Chamber at certain stages of the protocol even while the curtain to the witness room remains open. Any anonymous execution team members can conceal themselves in surgical garb, including masks, to resolve any concerns about identification.

161.    In the event Defendants use compounded pentobarbital for this alternative, Defendants must meet the following requirements to safeguard against the substantial of risk of pain inherent in improperly manufactured, transported, stored and administered compounded drugs; otherwise compounded drugs shall not be used.

162.    Defendants must use only those compounded execution drugs that are properly compounded in strict compliance with all requirements of USP <797>, and manufactured in strict compliance with all requirements of Current Good

Manufacturing Practice Regulations ("CGMP") under the Food, Drug, and Cosmetic Act.

163.    Defendants shall not use compounded execution drugs that are past their beyond-use date or that are otherwise adulterated.

164.    For any compounded execution drugs that are to be used in Plaintiffs' execution, Defendants and/or the "Direct Source" must provide to Plaintiffs, at least 30 days in advance of the execution date:

      a.    written, sworn verification of full compliance with all relevant manufacturing (CGMPs) or compounding (USP <797>) standards and requirements in the production of said execution drugs (including all requirements for matters such as sterile production, labeling, packing, shipping, storing, and using drug products as defined under the applicable set of standards), with such verification performed by a reputable, disclosed (to Plaintiffs' counsel), independent third party, and such verification to include satisfactory assessment of all testing data and other data generated in the manufacturing or compounding process under the relevant standards;

      b.    written, sworn verification of satisfaction of rigorous pre-execution analytical testing of the execution drug at a reputable, disclosed (to Plaintiffs' counsel), independent analytical testing laboratory to ensure the finished drug product is in full compliance with USP <797> or CGMPs, as applicable; and

c. written, sworn verification of having submitted to the federal FDA an Investigational New Drug ("IND") application for the use of the particular execution drug in the form and dosage to be used against Plaintiffs, and/or provide Plaintiffs a certified copy of that application.

165. Defendants must additionally test the final product and its components no more than two days before the scheduled execution, testing for identity, contaminants, bacterial endotoxins, pyrogens, concentration, sterility, proper pH level, potency, and purity.

166. At least one other state, Ohio, requires testing of compounded execution drugs for identity and potency.

167. Defendants must provide that test data to counsel for Plaintiff immediately upon receipt.

168. If the data generated by that analytical testing is outside the level acceptable under the applicable USP Monograph and any other authoritative source of standards for the drug, Defendants shall not proceed with the scheduled execution of Plaintiff for at least 60 days.

169. Each of these portions of this Alternative would significantly reduce the substantial risk of severe pain to which Plaintiffs are subjected by ensuring that the drug(s) used to execute Plaintiff meet the same rigorous standards applicable to all drugs to be administered to individuals in the United States.

170. Each of these portions of this Alternative merely require that Defendants ensure that the controlling statutes, rules, regulations, and standards

are followed, even behind the curtain of secrecy that Defendants have obtained regarding the execution drugs, thereby protecting Plaintiffs against the pain, suffering, and lingering death that would be caused by using improperly compounded pentobarbital for this alternative.

171. Additionally, these portions of this alternative are available with ordinary effort. They simply require that Defendants produce sworn documentation to confirm that all applicable statutes, rules, regulations, and standards are being followed in regards to the execution drugs.

172. Any Tennessee-licensed pharmacy that is compounding execution drugs is already required by Tennessee law to follow the requirements in USP <797>, and those requirements include the testing processes in production, the production of reports and other documentation, rigorous attention to quality control measures, and other such matters outlined above.

173. If Defendants' Direct Source who is compounding follows the law, then it should be a simple matter for Defendants to produce to Plaintiff such sworn verification.

174. Upon information and belief, Defendants' Direct Source is located outside the state of Tennessee. Plaintiffs allege that the law of the State where the Direct Source is located also requires compliance with USP <797>. If Defendants' Direct Source who is compounding follows the law, then it should be a simple matter for Defendants to produce to Plaintiff such sworn verification.

175.    The law governing IND Applications contains no exception for the use of drugs in an execution; regardless of whether such an application would be granted, Defendants can submit the IND Application with ordinary effort in the same way that myriad others submit such Applications, and producing verification of submitting that Application is available through ordinary effort as well.

176.    In the event Defendants use compounded pentobarbital for this alternative, Defendants must meet all of the following compliance requirements, otherwise said compounded drugs shall not be used:

    a.   Defendants must not use execution drugs obtained from a drug source who is non-compliant with the full scope of the alternative methods and procedures proffered here, and Defendants must present to Plaintiff in advance of execution, written, sworn verification of full compliance with all such alternative methods and procedures;

    b.   Defendants must not use execution drugs obtained from a drug source who has been found to be non-compliant with USP <797> standards during any state inspection in the last five years;

    c.   Defendants must identify the Direct Source to Plaintiffs' counsel in advance of execution so that counsel can ensure the relevant Direct Source has not been so found. Alternatively, if Plaintiffs are denied identification information for whatever reason, Defendants must present to Plaintiffs' counsel in advance of execution written, sworn verification that the Direct Source in question has not been found to

not be in compliance with USP <797> standards during any state

inspection in the last five years.

  d. Defendants must not use execution drugs obtained from a Direct

Source who the FDA has found in the last five years to be non-

compliant with CGMP standards. Defendants must identify the Direct

Source to Plaintiffs' counsel in advance of execution so that counsel can

ensure the relevant Direct Source has not been so found. Alternatively,

Defendants must present to Plaintiffs' counsel in advance of execution

written, sworn verification that the Direct Source has not violated

CGMP standards during any FDA or state inspection in the last five

years.

  177. The parts of this Alternative alleged in the preceding sub-paragraphs will significantly reduce the substantial risk of severe pain caused by compounded drugs. These alternatives ensure that the compounded drugs used to execute Plaintiffs meet the same rigorous standards applicable to all drugs administered to individuals in the United States.

  178. Compliance with such standards significantly reduces the substantial risk of serious pain caused by compounded drugs which: are not true in identity, concentration, potency and purity; contain contaminants, bacterial endotoxins and/or pyrogens; are not sterile; and/or have an improper pH level.

  179. Each of these portions of this Alternative merely require that Defendants ensure that the controlling statutes, rules, regulations, and standards

are followed even behind the curtain of secrecy that Defendants have obtained regarding the execution drugs, thereby protecting Plaintiffs against the pain and suffering that would be caused by using improperly compounded pentobarbital for this alternative.

180. These compliance requirements are readily available because they simply require Defendants to obtain verification of their Direct Source's compliance with applicable safety rules and standards. It also simply requires that execution drugs WILL NOT be used if they are produced by a drug source who has been found wanting in that regard.

181. In the event the Court finds Alternative 1 insufficient to satisfy the alternative-pleading requirement, other methods of feasible and readily available methods of execution substantially reduce the pain created by the July 5th Protocol.

**Proposed Alternative No. 2 – Two-Drug Method**

182. Defendants shall use a two-drug method consisting of two syringes containing 50 cc of midazolam (5 mg/mL solution), followed by a syringe of 50 cc of saline, followed by 60 cc of potassium chloride (50 mL of 2 mEq/mL solution) in each of two syringes for a total of 240 mEq/mL, followed by a syringe of 50 cc of saline.

183. The removal of a paralytic from a three-drug lethal injection procedure similar to that contained in the July 5th Protocol is a feasible and readily available alternative which substantially reduces the risk of pain inherent in the July 5th Protocol. *See First Amendment Coalition of Arizona, Inc. v. Ryan*, 188 F.Supp. 3d 940, 950-51 (D. Ariz. 2016).

184. This two-drug protocol significantly reduces the substantial risk of pain caused by Protocol B and the new unwritten protocol because it omits vecuronium bromide.

185. Eliminating the substantial risk of severe pain and suffering caused by suffocation via vecuronium bromide, as used the July 5th Protocol, by definition, will significantly reduce the substantial risk of severe pain caused by the July 5th Protocol.

186. Vecuronium bromide is a noxious stimulus.

187. Vecuronium bromide is not necessary to execute Plaintiffs.

188. The pain and suffering caused by vecuronium bromide is not necessary to execute Plaintiffs.

189. The inclusion of vecuronium bromide in the July 5th Protocol needlessly increases the risk that an execution will continue even as Plaintiffs are sensate to the severe pain and suffering caused by suffocation but will show no outward indications of such pain.

190. The inclusion of vecuronium bromide in the July 5th Protocol needlessly increases the risk that an execution will continue even as Plaintiffs are sensate to the severe pain and suffering caused by potassium chloride, but will show no outward indications of such pain.

191. Removal of vecuronium bromide from the July 5th Protocol significantly reduces the substantial risk of unnecessary pain and suffering caused by both protocols.

192.    In the event the Court finds Alternative 2 insufficient to satisfy the alternative-pleading requirement, other methods of feasible and readily available methods of execution substantially reduce the pain created by the July 5th Protocol.

**Plaintiff Miller's Proposed Alternative No. 3 – Euthanasia Oral Cocktail**

193.    On July 3, 2018, the State of Ohio conceded the existence of another available method of execution: "Defendants admit that they possess, or have within their control, or could obtain with ordinary transactional effort, midazolam, digoxin, morphine sulfate, and propranolol... For oral administration."

194.    In the event the Court finds Alternative 3 insufficient to satisfy the alternative-pleading requirement, other methods of feasible and readily available methods of execution substantially reduce the pain created by the July 5th Protocol.

**Plaintiffs' Proposed Alternative No. 4 – Firing Squad**

195.    The protocol found in the Procedure for Military Executions would significantly reduce the substantial risk of harm posed by the July 5th Protocol. (Section II, ¶¶ 10–12, Section VIII, ¶¶ 29–30, 32, Figure 5, and Figure 6, Army Regulations No. 633-15, Procedure for Military Executions (Apr. 7, 1959), hereinafter "Procedures for Military Executions").

196.    Upon information and belief, Defendants possess or have within their control, or could readily obtain, the firearms necessary to carry out an execution according to the Procedures for Military Executions.

197.    Upon information and belief, Defendants possess or have within their control, or could readily obtain, the ammunition necessary to carry out an execution according to the Procedures for Military Executions.

198.    Upon information and belief, Defendants employ or have within their control, or could readily obtain, the personnel necessary to carry out an execution according to the Procedures for Military Executions.

199.    Upon information and belief, Defendants employ or have within their control, or could readily obtain, persons who regularly train with firearms at the Big Buck Shooting Range located at Riverbend Maximum Security Institution.

200.    Upon information and belief, Defendants employ or have within their control, or could readily obtain, trained professional marksmen to carry out the execution according to the Procedures for Military Executions.

201.    The use of trained and experienced professionals significantly reduces any error rate in firing-squad executions carried out according to the Procedures for Military Executions.

202.    The Procedures for Military Executions provide a back-up plan in case of human error or mistake—the "coup de grace." AR 633-15, § II, ¶ 12(c), Procedures for Military Executions.

203.    Upon information and belief, this manner and method of execution is feasible and readily implemented under Tenn. Code Ann. § 40-23-114(d) because it constitutes "any constitutional method of execution."

204.    The Supreme Court has upheld the firing squad as a method of execution. *Wilkerson v. Utah*, 99 U.S. 130, 134-35 (1878).

205.    Upon information and belief, this manner and method of execution is feasible and readily implemented because the Big Buck Shooting Range is located on the grounds of Riverbend Maximum Institution and can easily accommodate the equipment required for an execution by firing squad. See AR 633-15, § II, ¶ 12(c), Procedures for Military Executions.

206.    Upon information and belief, execution by this manner and method would damage the heart and cause a near immediate drop in blood pressure, including blood pressure in the brain. This will cause a loss of consciousness rapidly followed by death.

207.    Execution by this manner and method would not permit Plaintiffs to experience any of the unnecessary and severe pain and suffering caused by suffocation due to paralysis and the injection of potassium chloride caused by the July 5th Protocol.

208.    Eliminating the substantial risk of unnecessary and severe pain and suffering posed by the July 5th Protocol, by definition, will significantly reduce the substantial risk of unnecessary and severe pain to which Plaintiff is subjected by the current execution method.

209.    The firing squad significantly reduces a substantial risk of severe pain when compared with the midazolam-based three-drug protocol lethal injection.  A study of executions from 1900 to 2010, for example, concluded that while 7.12

{41}

percent of the 1,054 lethal-injection executions were "botched," none of the 34 firing-squad executions went awry. *Glossip*, 135 S. Ct. at 2796 (Sotomayor, J., dissenting) (citing A. Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty* 177 (2014)); *see also Wood v. Ryan*, 759 F.3d 1076, 1103 (9th Cir. 2014)(the firing squad is "foolproof"; lethal injection is "inherently flawed and ultimately doomed to failure."); Deborah W. Denno, *The Firing Squad as a "Known and Available Method of Execution" Post-Glossip*, 49 U. Mich. J. L. Reform 749, 781 (2016) (A "study of executions from 1976 to 2001 failed to detect any botched firing squad executions, even though other methods, including lethal injection, were consistently problematic." (citing Arif Khan & Robyn M. Leventhal, *Medical Aspects of Capital Punishment Executions*, 47 J. Forensic Sci. 847, 849–50 (2002)). "Just as important, there is some reason to think that [death by firing squad] is relatively quick and painless." *Glossip*, 135 S. Ct. at 2796 (Sotomayor, J., dissenting).

210.    Other states—Mississippi, Oklahoma, and Utah—include execution by firing squad among their statutory manners of execution. *See* Miss. Code Ann. § 99-19-51; Okla. Stat. Ann. tit., 22 § 1014; Utah Code Ann. § 77-18-5.5.

211.    Utah recently executed Ronnie Lee Gardner by firing squad. *See* Kirk Johnson, *Double Murder Executed by Firing Squad in Utah*, N.Y. Times, June 19, 2010, at A12, available at https://www.nytimes.com/2010/06/19/us/19death.html.

212.    The firing squad is used around the world as a method of execution. Approximately 28 countries conduct firing-squad executions. *See* "*Methods of Execution*," Cornell Center on the Death Penalty Worldwide (June 22, 2012),

available at http://www.deathpenaltyworldwide.org/methods-of-execution.cfm.  Of the 58 countries retaining capital punishment, five times as many use firing squads as use lethal injection.  *See id.*; *see also* "*Death Sentences and Executions: 2015,*" Amnesty Int'l Global Report, available at

https://www.amnesty.org/download/Documents/ACT5034872016ENGLISH.PDF.

213.    For more than 400 years, the firing squad has been an available execution method in the United States. The first recorded firing squad execution took place in 1608, when the colony of Virginia executed George Kendall for conspiring with Spain. Denno, *supra* p.42, at 778.  After the Supreme Court reinstated the death penalty in 1976 following a nine-year hiatus, *see Gregg v. Georgia*, 428 U.S. 153 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), the first executed inmate died at the hands of a five-man firing squad just one year later.  Kirk Johnson, *In Utah, Execution Evokes Eras Past*, N.Y. Times, June 16, 2010, at A15, available at

https://www.nytimes.com/2010/06/17/us/17death.html?_r=0.  In all, firing squads have executed 144 American inmates.  Denno, *supra* p.42*,* at 778. Thus, the firing squad is clearly a known execution method.

214.    Judges have noted the feasibility of the firing squad as an execution method. *See*, *e.g.*, *Wood,* 759 F.3d at 1103 (Kozinski, C.J., dissenting from denial of rehearing en banc) (noting that "large-caliber rifle bullets fired at close range can inflict massive damage, causing instant death every time. There are people employed by the state who can pull the trigger and have the training to aim true.

The weapons and ammunition are bought by the state in massive quantities for law enforcement purposes, so it would be impossible to interdict the supply.").

215. This manner and method of execution is feasible and readily implemented because the firing squad is a "constitutional method of execution." Tenn. Code Ann. § 40-23-114(d). If required, the "legislature could, tomorrow, enact a statute reinstating the firing squad as an alternative method of execution." *In re Campbell*, 874 F.3d 454, 465 (6th Cir. 2017) (discussing Ohio's execution procedures).

216. Should the Court determine Plaintiffs' remaining causes of action must also plead a feasible and readily available alternative method of execution which substantially reduces the pain and suffering caused by the July 5th Protocol, Plaintiffs incorporate the forgoing allegations of such alternatives into all causes of action.

## COUNT II
## Eighth and Fourteenth Amendments
## (VIOLATION OF EVOLVING STANDARDS OF DECENCY)

217. The July 5th Protocol violates evolving standards of decency guaranteed by the Eighth and Fourteenth Amendments.

218. The Eighth Amendment to the United States Constitution imposes a duty on upon the "government to respect the dignity of all persons." *Hall v. Florida*, __ U.S. __, 134 S. Ct. 1986, 1992 (2014). The United States Supreme Court has held that the "Eighth Amendment is not fastened to the obsolete." *Id*. To enforce the constitutional obligation to protect the dignity of man, courts are required to "look

{44}

to evolving standards of decency that mark the progress of a maturing society."

*Hall*, 134 S. Ct. at 1992 (citing *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

219.   Because the Eighth Amendment is not static, courts are required to consider contemporary standards.

220.   Courts consider trends in legislation and practice in determining whether a particular punishment violates evolving standards of decency. Midazolam was once used for lethal injection in seven states. Within less than ten years, three states have abandoned the practice. Only four states use it now.

The removal of midazolam from the protocols of 42% of the states formerly using the drug demonstrates an evolving standard of decency which requires the abandonment of the use of midazolam to carry out an execution.

## COUNT III
### Eighth and Fourteenth Amendments
### (INTENTIONAL INFLICTION OF UNNECESSARY PAIN, AS APPLIED)

221.   Defendants have actual knowledge that, if Plaintiffs are executed in accordance with this protocol, Plaintiffs will experience unnecessary pain and suffering during their executions which is substantially greater than the pain and suffering caused by other feasible and readily available methods of carrying out their sentences of death.

222.   Defendants were warned by their supplier of midazolam that midazolam would not prevent Plaintiffs from experiencing the pain and suffering of involuntary paralysis and suffocation caused by vecuronium bromide, the pain and suffering caused by potassium chloride as it passes through their veins, and the pain and suffering caused by cardiac arrest.

{45}

223.    Notwithstanding court decisions allowing other States to use midazolam-based lethal injection protocols, Defendants have actual knowledge that, during his execution, Billy Ray Irick responded to noxious stimuli –  including, but not limited to, the accumulation of fluid in his lungs – from shortly after he was administered 500 mg of midazolam, during the putative "consciousness check" administered by Defendant Mays, and following the putative "consciousness check" until such time as the vecuronium bromide paralyzed his diaphragm.

224.    Notwithstanding court decisions allowing other States to use midazolam-based lethal injection protocols, Defendants have actual knowledge that, in other States using protocols similar to the July 5th Protocol, condemned inmates have responded to noxious stimuli – including, but not limited to, the accumulation of fluid in their lungs – from shortly after they were administered midazolam until such time as the paralytic drug required under the protocols of the states in which they were executed paralyzed their diaphragms.

225.    Notwithstanding court decisions allowing other States to use midazolam-based lethal injection protocols, Defendants know, or should know, observers to three-drug-protocol executions have reported condemned inmates responding to noxious stimuli – including, but not limited to, the accumulation of fluid in their lungs – from shortly after they were administered midazolam until such time as the paralytic drug required under the protocols of the states in which they were executed paralyzed their diaphragms.

226. Defendants know, or should know:

    a. On August 9, 2018, the State of Tennessee executed Billy Ray Irick using the July 5th Protocol;

    b. Following the injection of 100 ml of a 5mg/ml solution (a total of 500 mg) of midazolam, fluid began to accumulate in Mr. Irick's lungs, making it more difficult for him to breathe. Witnesses to his execution saw Irick's stomach move up and down, his breathing become labored, and him begin to snore;

    c. According to witnesses to Irick's execution, seven minutes after the injection of midazolam began, Defendant Mays approached Mr. Irick, brushed his eyelash, called his name loudly two times, and shook his shoulder. Defendant Mays then gave the order to administer 100 ml of a 1 mg/ml solution (a total of 100 mg) of vecuronium bromide;

    d. Throughout the preceding seven minutes, fluid had continued to accumulate in Irick's lungs;

    e. Before the vecuronium bromide paralyzed Mr. Irick (including his diaphragm, the muscle used to control the lungs), making it impossible for him to move, enough fluid had accumulated in Mr. Irick's lungs that he began to gasp and to cough in an attempt to expel the accumulated fluid. This gasping and coughing was observed by witnesses to his execution;

    f. Mr. Irick remained conscious throughout this time;

g. After the vecuronium bromide paralyzed Mr. Irick, witnesses to his execution observed that he had become motionless;

h. Though motionless, Mr. Irick remained conscious;

i. Mr. Irick was aware of both his involuntary paralysis and his ongoing suffocation caused by the use of vecuronium bromide until his death;

j. After Mr. Irick had consciously suffocated for between three to four minutes, he was injected with 120 ml of a 2 mEq/ml solution (a total of 240 mEq) of potassium chloride;

k. Mr. Irick remained conscious after the injection of potassium chloride until after the complete cessation of cardiac activity;

l. Mr. Irick was aware of pain caused by potassium chloride as it passed through his veins;

m. The pain and suffering caused by potassium chloride as it passed through a human being's veins has been described as "liquid fire" and/or "being burned alive from the inside;"

n. Mr. Irick was aware of this pain and suffering for three to four minutes;

o. After three to four minutes of this pain and suffering, a sufficient amount of potassium chloride reached Mr. Irick's heart to cause cardiac arrest;

p. Mr. Irick was aware of the pain and suffering caused by cardiac arrest;

q.  It was not until after he had experienced cardiac arrest that Mr. Irick ceased experiencing the pain and suffering caused by the July 5th Protocol.

r.  On October 19, 2017, the state of Alabama executed Torrey McNabb under a three-drug protocol utilizing 500 mg of midazolam as the first drug;

s.  During execution and after administration of 500 mg of midazolam, Mr. McNabb responded when his arm was pinched;

t.  After a second dose of 500 mg of midazolam, Mr. McNabb responded when his name was called and moved his arm when he was pinched;

u.  Minutes after the second check for consciousness, Mr. McNabb raised his arm and moved his arms and legs;

v.  During the execution, Mr. McNabb curled his lips, furrowed his brow, and grimaced;

w.  It is very likely that Mr. McNabb suffered pain caused by the paralytic drug and potassium chloride.

x.  On September 13, 2017, Ohio executed Gary Otte using 500 mg of midazolam as the first drug of a three drug protocol;

y.  During execution and after administration of 500 mg of midazolam, Mr. Otte turned his head and blinked in an exaggerated manner;

{49}

z. During execution and after administration of 500 mg of midazolam, Mr. Otte's breathing became abnormal and his stomach moved violently;

aa. During execution and after administration of 500 mg of midazolam, Mr. Otte produced active tears;

bb. One who is unaware does not produce active tears;

cc. It is very likely that Mr. Otte suffered pain caused by the paralytic drug and potassium chloride.

dd. On April 28, 2017, Arkansas executed Kenneth Williams using 500 mg of midazolam as the first drug of a three drug protocol;

ee. During the execution and after administration of 500 mg of midazolam, Mr. Williams coughed, convulsed, lurched, and jerked 15 times;

ff. Mr. Williams emitted a sound heard without a microphone by witnesses;

gg. It is very likely that Mr. Williams suffered pain from vecuronium bromide and potassium chloride;

hh. On December 8, 2016, Alabama executed Ronald Smith, Jr., with a three drug protocol using midazolam as the first drug;

ii. Mr. Smith moved his lips before and after 500 mg of midazolam were administered;

jj. Mr. Smith raised his head and clenched his fist after midazolam was administered;

kk. Mr. Smith responded to all three stimuli in the first check for consciousness – calling his name, moving his eyelid, and pinching his arm;

ll. Mr. Smith heaved and gasped after the first test for consciousness;

mm. A second dose of 500 mg of midazolam was administered to Mr. Smith;

nn. When a corrections officer tried to close Mr. Smith's eyelid he opened it again;

oo. After administration of 1000 mg of midazolam and more than 20 minutes into the execution, Mr. Smith moved his right arm and hand when pinched during a second test for consciousness;

pp. Mr. Smith struggled for air, heaved and coughed for 13 minutes;

qq. It took almost 40 minutes for Mr. Smith to die;

rr. It is very likely that Mr. Smith suffered pain from the paralytic drug and potassium chloride.

ss. On July 23, 2014, it took almost two hours for Joseph Wood to die under Arizona's two drug protocol with midazolam as the first drug, followed by hydromorphone;

tt. Eleven minutes after the administration of 50 mg of midazolam, Mr. Wood began gasping for air;

uu. Mr. Wood received a total dose of 750 mg of midazolam;

vv. Mr. Wood gasped for air and snorted more than 600 times before he died;

ww.    It is very likely that Mr. Wood suffered pain during his execution.

xx. On January 16, 2014, Ohio executed Dennis McGuire using a two drug protocol with 10 mg midazolam as the first drug, followed by hydromorphone;

yy. Mr. McGuire audibly gasped and struggled for air for more than 10 minutes;

zz. Mr. McGuire clenched his fists, arched his back and writhed;

aaa.    His execution lasted more than 20 minutes;

bbb.    It is very likely that Mr. McGuire suffered pain during his execution.

ccc.    On October 15, 2013, Florida executed William Happ using a three drug protocol with 10 mg of midazolam as the first drug;

ddd.    After the administration of midazolam, Mr. Happ's eyes opened and he blinked several times before closing them;

eee.    Two minutes later, Mr. Happ opened his eyes;

fff.    Seven minutes into the execution, Mr. Happ moved his head back and forth;

ggg.    His execution took 14 minutes; and,

hhh.     It is very likely that Mr. Happ suffered pain from the paralytic

drug and potassium chloride.

227.     Defendants are further informed by the expert testimony presented by

the plaintiffs in the state chancery court action.

228.     Notwithstanding this knowledge, Defendants intentionally inflicted

unnecessary pain and suffering on inmate Billy Ray Irick under the July 5th

Protocol.

229.     Defendants intend to inflict the same pain and suffering upon

Plaintiffs.

230.     Though Plaintiffs have previously alleged alternative methods of

execution which are feasible and readily implemented in this complaint. The Eighth

and Fourteenth Amendments are violated whenever a method of punishment

intentionally inflicts unnecessary pain.

## COUNTS IV
### Eighth and Fourteenth Amendments
### (AS APPLIED TO PLAINTIFFS' INDIVIDUAL CHARACTERISTICS)

231.     Plaintiffs presents with individual characteristics which increase both

the substantial risk they will experience pain and suffering and/or the severity of

the pain and suffering they will experience.

232.     Regarding Plaintiff Miller, they include, but are not limited to, high

cholesterol, obesity, tuberculosis infection, a history of polysubstance abuse—

including alcohol abuse—poor impulse control, anxiety, panic disorder and major

depression with psychotic features.

233.    There exists a substantial risk the July 5th Protocol will subject Plaintiff Miller to increased unnecessary and severe pain due to his individual characteristics.

234.    Plaintiff Miller has a history of high cholesterol, obesity and tuberculosis infection. Deep vein thrombosis is associated with tuberculosis infection. Each characteristic makes it significantly more difficult to achieve and/or maintain peripheral IV access on Plaintiff Miller.

235.    Proper peripheral IV access must be maintained to ensure proper delivery of the drugs in Tennessee's lethal injection protocol. There is a substantial risk that, because of his individual characteristics, Plaintiff Miller will suffer additional unnecessary and serious pain as Defendants attempt to achieve IV access on him.

236.    Plaintiff Miller will suffer additional unnecessary and severe pain and suffering as Defendants stab him with needles repeatedly and/or cut open his skin and the amount of that pain will be substantial.

237.    There is a substantial risk that, due to his individual characteristics, Plaintiff Miller will suffer unnecessary and serious pain when Defendants are unable to maintain peripheral IV access on them.

238.    Infiltration of drugs into the subcutaneous area of Plaintiff Miller's extremities (or any other location in his body) will cause additional unnecessary and serious pain and the amount of such pain will be substantial.

{54}

239.   Any infiltration of drugs will substantially reduce the intended effectiveness of the drugs used in Tennessee's July 5th Protocol. Such reduction in effectiveness will result in added and substantial serious pain and suffering and a substantially more lingering death.

240.   There is a substantial risk that Miller's individual physical characteristics will interfere with the proper delivery of the drugs in the July 5th Protocol.

241.   Improper delivery of the execution drugs presents a risk that is sure or very likely to cause serious illness, needless suffering, and/or a lingering death.

242.   Plaintiff Miller's characteristics of being a male, over the age of 50, Body Mass Index of greater than 35, neck size greater than 40 cm, snoring, and Deep Vein Thrombosis establish several of the risk factors of the STOP-Bang test used to assess the risk of Obstructive Sleep Apnea (OSA).

243.   Plaintiff Miller's characteristics constitute a substantial risk that, during execution under the July 5th Protocol, he will obstruct and begin to suffocate and experience the painful sensations of air hunger while he remains aware or sensate.

244.   This unnecessary pain from air hunger will be substantial and will be superimposed on the serious pain caused by the painful injection and subsequent suffocation induced by vecuronium bromide and the burning of the circulatory system and involuntary cardiac arrest caused by potassium chloride, as alleged herein.

245. The use of commercially manufactured midazolam or compounded midazolam in the new July 5th Protocol contains an inherent risk that all Plaintiffs will experience a paradoxical effect from the drug.

246. Plaintiff Miller's individual characteristics of his age, his male gender, his history of anxiety and panic disorder, major depression with psychotic features, his history of polysubstance abuse—including alcohol abuse, and his history of poor impulse control and impulsive actions substantially increases the risk that he will have a paradoxical reaction to the execution drug(s).

247. Moreover, as his execution dates near, Plaintiff Miller will experience increased levels of stress and distress.

248. The July 5th Protocol fails to account for any unique characteristics of Plaintiff Miller that may affect the efficacy of or the risk of harm caused by the July 5th Protocol.

249. Defendants have failed to properly prepare or train the execution team for any of the unique challenges Plaintiff Miller's current individual characteristics may present while carrying out the execution.

250. Regarding Plaintiff Sutton, they include, but are not limited to Chronic Obstructive Pulmonary Disorder (COPD), a history of polysubstance abuse, including alcohol abuse, and poor impulse control.

251. There exists a substantial risk the July 5th Protocol will subject Plaintiff Sutton to increased unnecessary and severe pain due to his individual characteristics.

252. Plaintiff Sutton's characteristics of COPD increases the risk of apnea during the administration of midazolam and substantially increases the pain and suffering caused by the administration of vecuronium bromide.

253. Plaintiff Sutton's characteristics constitute a substantial risk that, during execution under the July 5th Protocol, he will obstruct and begin to suffocate and experience the painful sensations of air hunger while he remains aware or sensate.

254. This unnecessary pain from air hunger will be substantial and will be superimposed on the serious pain caused by the painful injection and subsequent suffocation induced by vecuronium bromide and the burning of the circulatory system and involuntary cardiac arrest caused by potassium chloride, as alleged herein.

255. The use of commercially manufactured midazolam or compounded midazolam in the new July 5th Protocol contains an inherent risk that all Plaintiffs will experience a paradoxical effect from the drug.

256. Plaintiff Sutton's individual characteristics of his age, his male gender, his history of polysubstance abuse—including alcohol abuse, and his history of poor impulse control and impulsive actions substantially increases the risk that he will have a paradoxical reaction to the execution drug(s).

257. Moreover, as his execution dates near, Sutton will experience increased levels of stress and distress.

258.     The July 5th Protocol fails to account for any unique characteristics of Plaintiff Sutton that may affect the efficacy of or the risk of harm caused by the July 5th Protocol.

259.     Defendants have failed to properly prepare or train the execution team for any of the unique challenges Plaintiff Sutton's current individual characteristics may present while carrying out the execution.

260.     Regarding Plaintiff West, they include, but are not limited to, chronic diabetes-related illness,  a history of polysubstance abuse—including alcohol abuse, poor impulse control, anxiety and major depression with psychotic features.

261.      There exists a substantial risk the July 5th Protocol will subject Plaintiff West to increased unnecessary and severe pain due to his individual characteristics.

262.     Plaintiff West has a history of chronic diabetes-related illness. Diabetes-related illnesses are associated with compromising of the circulatory system. This characteristic makes it significantly more difficult to achieve and/or maintain peripheral IV access on Plaintiff West.

263.     Proper peripheral IV access must be maintained to ensure proper delivery of the drugs in Tennessee's lethal injection protocol. There is a substantial risk that, because of his individual characteristics, Plaintiff West will suffer additional unnecessary and serious pain as Defendants attempt to achieve IV access on him.

264. Plaintiff West will suffer additional unnecessary and severe pain and suffering as Defendants stab him with needles repeatedly and/or cut open his skin and the amount of that pain will be substantial.

265. There is a substantial risk that, due to his individual characteristics, Plaintiff West will suffer unnecessary and serious pain when Defendants are unable to maintain peripheral IV access on them.

266. Infiltration of drugs into the subcutaneous area of Plaintiff West's extremities (or any other location in his body) will cause additional unnecessary and serious pain and the amount of such pain will be substantial.

267. Any infiltration of drugs will substantially reduce the intended effectiveness of the drugs used in Tennessee's lethal injection protocol. Such reduction in effectiveness will result in added and substantial serious pain and suffering and a substantially more lingering death.

268. There is a substantial risk that West's individual physical characteristics will interfere with the proper delivery of the drugs in the Execution Protocol.

269. Improper delivery of the execution drugs presents a risk that is sure or very likely to cause serious illness, needless suffering, and/or a lingering death.

270. Plaintiff West's characteristics of being a male, over the age of 50 with compromised circulation, establish several of the risk factors of the STOP-Bang test used to assess the risk of Obstructive Sleep Apnea (OSA).

271.    Plaintiff West's characteristics constitute a substantial risk that, during execution under the July 5th Protocol, he will obstruct and begin to suffocate and experience the painful sensations of air hunger while he remains aware or sensate.

272.    This unnecessary pain from air hunger will be substantial and will be superimposed on the serious pain caused by the painful injection and subsequent suffocation induced by vecuronium bromide and the burning of the circulatory system and involuntary cardiac arrest caused by potassium chloride, as alleged herein.

273.    The use of commercially manufactured midazolam or compounded midazolam in the new July 5th Protocol contains an inherent risk that all Plaintiffs will experience a paradoxical effect from the drug.

274.    Plaintiff West's individual characteristics of his age, his male gender, his history of anxiety, major depression with psychotic features, his history of polysubstance abuse, including alcohol abuse, and his history of poor impulse control and impulsive actions substantially increases the risk that he will have a paradoxical reaction to the execution drug(s).

275.    Moreover, as his execution dates near, West will experience increased levels of stress and distress.

276.    The July 5th Protocol fails to account for any unique characteristics of Plaintiff West that may affect the efficacy of or the risk of harm caused by the July 5th Protocol.

277.    Defendants have failed to properly prepare or train the execution team for any of the unique challenges Plaintiff West's current individual characteristics may present while carrying out the execution.

278.    Regarding Plaintiff McKay, they include, but are not limited to, right shoulder pain, cervical radiculitis, a history of an abnormal electrocardiogram, and a history of renal failure. In addition, McKay is currently being treated with Gabapentin.

279.    There exists a substantial risk the July 5th Protocol will subject Plaintiff McKay to increased unnecessary and severe pain due to his individual characteristics.

280.    Plaintiff McKay's history of renal failure and an abnormal electrocardiogram are consistent with vascular degeneration. This characteristic makes it significantly more difficult to achieve and/or maintain peripheral IV access on Plaintiff McKay.

281.    Proper peripheral IV access must be maintained to ensure proper delivery of the drugs in Tennessee's lethal injection protocol. There is a substantial risk that, because of his individual characteristics, Plaintiff McKay will suffer additional unnecessary and serious pain as Defendants attempt to achieve IV access on him.

282.    Plaintiff McKay will suffer additional unnecessary and severe pain and suffering as Defendants stab him with needles repeatedly and/or cut open his skin, and the amount of that pain will be substantial.

283. There is a substantial risk that, due to his individual characteristics, Plaintiff McKay will suffer unnecessary and serious pain when Defendants are unable to maintain peripheral IV access on him.

284. Infiltration of drugs into the subcutaneous area of Plaintiff McKay's extremities (or any other location in his body) will cause additional unnecessary and serious pain, and the amount of such pain will be substantial.

285. Any infiltration of drugs will substantially reduce the intended effectiveness of the drugs used in Tennessee's July 5th Protocol. Such reduction in effectiveness will result in added and substantial serious pain and suffering and a substantially more lingering death.

286. There is a substantial risk that McKay's individual physical characteristics will interfere with the proper delivery of the drugs in the Execution Protocol.

287. Improper delivery of the execution drugs presents a risk that is sure or very likely to cause serious illness, needless suffering, and/or a lingering death.

288. Plaintiff McKay's chronic and severe Plaintiff McKay's right shoulder pain increases the risk that he will suffer substantial and unique pain from Tennessee's use of a restraint system designed to conceal the inmate's conscious resistance to the pain of the July 5th Protocol.

289. The July 5th Protocol fails to account for any unique characteristics of Plaintiff McKay that may affect the efficacy of or the risk of harm caused by the July 5th Protocol.

290.     Defendants have failed to properly prepare or train the execution team for any of the unique challenges Plaintiff McKay's current individual characteristics may present while carrying out the execution.

291.     Because Defendants do not account for any individual characteristics any condemned inmate possesses at the time an execution is imminent, there exists additional substantial risks of unnecessary and serious harm to Plaintiffs that is unique.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request temporary, preliminary and permanent injunctive relief to enjoin the Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from executing Plaintiffs under the July 5th Protocol.

Respectfully submitted,

FEDERAL DEFENDER SERVICES
 OF EASTERN TENNESSEE, INC.

s/Dana C. Hansen Chavis
Dana C. Hansen Chavis, TN BPR No. 19098
Asst. Federal Community Defender
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone: (865) 637-7979
Facsimile: (865) 637-7999
Dana_Hansen@fd.org

Attorney for Plaintiffs David Earl Miller,
Nicholas Todd Sutton, Stephen Michael
West, and Larry McKay